UNITED STATES v. MURPHY et al.

(District Court, N. D. New York. July 12, 1915.)

1. JURY ⬤66—JURY LIST—SELECTION OF NAMES—STATUTORY PROVISIONS.

Judicial Code (Act March 3, 1911, c. 231) § 276, 36 Stat. 1164 (Comp. St. 1913, § 1253), provides that jurors shall be drawn from a box the names in which shall have been placed therein by the clerk of the court and a commissioner appointed by the judge, who shall be a citizen of good standing and a well-known member of the principal political party opposing that to which the clerk may belong, and that the clerk and commissioner shall each place one name in the box alternately without reference to party affiliations until the whole number required shall be placed therein. An assistant United States attorney, at the request of the jury commissioner, obtained the petit jury list of a county for use in the state courts, but, not feeling at liberty to send such list out of the city, copied a part, but not all, of the names on the list, and added 108 names not on the list. The jury commissioner made inquiries concerning such names of such attorney and other reputable persons, and made some additions, and the clerk of the court also added other names; but the names placed in the jury box were very largely taken from the list prepared by the attorney, and included some of the 108 names not taken from the jury list. Held, that a challenge to the panel would be sustained, as the statute requires the selection of names to be made by the commissioner and the clerk, and, though other persons may answer proper inquiries, and give information as to the character and fitness of persons whose names are under consideration, they may not select nor suggest names, and, though the defendants might not be prejudiced by the manner in which the names were selected, it could not be known that they would not be prejudiced.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 283–290, 306; Dec. Dig. ⬤66.]

2. JURY ⬤66—JURY LIST—SELECTION OF NAMES—STATUTORY PROVISIONS.

In selecting lists of names of jurors for service in the courts of the United States, there is no law or rule of court requiring an apportionment of the names selected in accordance with the population of the various towns and wards in a county, or in proportion to the persons liable to jury duty residing therein.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 283–290, 306; Dec. Dig. ⬤66.]

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. Jury ⊚⟶66—Jury List—Selection of Names—Statutory Provisions.

In selecting names to be placed in the jury box, the clerk of the court and the jury commissioner each has a right to select his names, absolutely independent of the other.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 283–290, 306; Dec. Dig. ⊚⟶66.]

Richard Murphy and others were indicted for offenses. On challenge to the panel of jurors. Panel discharged.

When the United States attorney moved this indictment for trial the defendants challenged the entire panel, on the ground that the names of jurors contained in the jury box, and from which the panel of jurors serving at this June, 1915, term of this court was drawn, were not selected and placed in such jury box in the mode and manner prescribed by law or the statutes of the United States providing therefor, but in violation thereof, and that the greater number of the names placed and contained in such box—in fact, nearly all —were in fact selected and designated (although adopted by the commissioner of jurors and clerk) by one of the assistant United States attorneys for the Northern district of New York and residing in the county from which such names of jurors were to be selected, and that such box contained and contains, and that the panel of jurors drawn from such box for service at this term of court, contains, the names of many of the friends, neighbors, and clients of said assistant United States attorney, and that such panel is composed of an illegal and prejudiced, or liable to be prejudiced, body of men, whereby the rights of the defendants are jeopardized or imperiled. On the other hand, while it is not denied that the assistant United States attorney copied off from the petit jury list of Onondaga county, N. Y., a list of names of residents and citizens of the county of Onondaga liable to jury duty and competent and fit to serve as jurors, to which was added about 108 names not on such list, and that a large number of such names, including the 108, went into the jury box from which panels for service at the several terms of court to be held in such county are to be drawn from time to time, it is contended that such list was a mere suggestion of fit and proper names to go in such box; that it was submitted to the commissioner of jurors and examined by him as a guide and suggestion merely, he making inquiries of other and disinterested persons well informed and competent to judge in the matter, and that he then accepted such names, with some changes or additions, as a fair and proper and representative list of names to go in such box; that, in point of fact, the box and panel contains the names of persons who are qualified and competent to serve as jurors, and who are unbiased and without prejudice, and that the selection of names was a proper one in fact, and that of the commissioner of jurors and of the clerk of the court, acting jointly as they should; and that in all respects there was a substantial compliance with the statute. The challenge having been duly interposed, this court appointed George W. O'Brien and Leroy B. Williams, of the city of Syracuse, in said county, to act as counsel and aid in properly developing the facts and the truth relevant to the challenge made, to the end that a correct conclusion may be reached. The material and relevant facts appear in the opinion.

John H. Gleason, U. S. Atty., of Albany, N. Y., and Frank J. Cregg, Asst. U. S. Atty., of Syracuse, N. Y.

Elon R. Brown, of Watertown, N. Y., and Chas. N. Bulger, of Oswego, N. Y., for defendants.

Geo. W. O'Brien and Leroy B. Williams, both of Syracuse, N. Y., appointed by the court.

RAY, District Judge (after stating the facts as above). [1] Prior to March 23, 1915, the United States District Judge of the Northern District of New York, at the suggestion of the United States at-

torney for said district, and deeming it advisable and proper, directed that a new jury list or list of names be selected from the county of Onondaga to be placed in the jury box to be used for the drawing of jurors to serve at terms of the United States court to be held in said county. This was to be done under and pursuant to the statute and in accordance therewith by Alexander H. Crounse, commissioner of jurors, and the clerk of this court. Mr. Crounse resided in the county of Albany, N. Y., at a distance of about 150 miles from the county of Onondaga, while the clerk of the court resided and resides in the county of Oneida, in the neighborhood of 50 miles from the city of Syracuse, Onondaga county. The compensation allowed to the clerk of the court and to the commissioner of jurors for their services in making up jury lists, including the selection of names, preparing slips, and placing same in the box, and later drawing and attending to drawing panels of grand and petit jurors, is $75 per year each. In the Northern district of New York, the city of Albany, Albany county, the city of Binghamton, Broome county, the city of Auburn, Cayuga county, the city of Utica, Oneida county, and the city of Syracuse, Onondaga county, are designated by statute as the places for holding regular terms of court. It is evident, and has been several times decided in similar cases, that it was not contemplated that the clerk and commissioner of jurors should visit and abide in the several counties from which jurors are to be selected for a sufficient length of time to familiarize themselves or become acquainted with the citizens subject to jury duty and competent to act as jurors, but that it was anticipated these officers, in performing their duties, would obtain information from various legitimate sources, including, undoubtedly, personal inquiry. It has always been the custom, whether warranted by law or not, for these officers, in making up lists and selecting names of persons to act as jurors, to make inquiry of various well-informed persons, obtain lists from various sources, usually the grand and petit jury lists of the several counties, and then make a selection of names based on the information thus derived, and not on personal acquaintance or actual knowledge as to the qualifications and fitness of the persons whose names have thus been finally selected to go in the box.

In February and March, 1915, one of the assistant United States attorneys for said district was frequently in the city of Albany, where the United States attorney resides, and where during those months a term of the United States District Court was being held. He was, of course, frequently in the office of the United States attorney, as it was his duty to be when not in court, and here and at the government building, where court was held, he met the jury commissioner on several occasions. The jury commissioner is not provided with a clerk or stenographer, or funds with which to employ one. The assistant United States attorney has no such assistant, or funds allowed with which to employ one. The United States attorney is allowed a stenographer. Mr. Crounse, the United States commissioner of jurors at that time, residing in the county of Albany as stated, was appointed such on the recommendation of the United States attorney, with the approval of the Department of Justice. He was not supposed to be, and there is

no evidence that he was, under the influence of the United States attorney, with whom he had been acquainted for some years, unless it be that personal acquaintance and friendship created such a condition. The commissioner of jurors was not acquainted with the assistant United States attorney until about that time. There is no relationship by blood or marriage or in business matters between the United States attorney and Mr. Crounse, or between Mr. Crounse and the assistant United States attorney. The commissioner of jurors had no acquaintance in the city of Syracuse or county of Onondaga, and the clerk of the court had but very limited acquaintance there.

The evidence shows that in selecting the names of jurors to go in the box for Onondaga county, from which panels were to be drawn for service at subsequent terms of court held therein, the following course was pursued and the following things done, viz.: Mr. Crounse applied to the commissioner of jurors for the county of Onondaga, a state officer, for the grand and petit jury lists used by the state courts in that county, and which lists are in fact made up by the commissioner of jurors for that county, who is appointed by the judges. The grand jury list contains about 500 names, while the petit jury list contains about 6,000 or 7,000 names. Mr. Crounse was furnished the grand jury list for the county of Onondaga, but was informed that the petit jury list was not available. The commissioner then saw the assistant United States attorney in Albany, and requested him to secure, if possible, the petit jury list for the county of Onondaga. He did secure that list, but did not feel at liberty to deliver same to Mr. Crounse or remove same from the city of Syracuse, and proceeded to have a list copied off, containing at least 500 names or more. This list may have contained three or four times that number, but it was not a copy of the entire list. This list caused to be made by him from the jury list of Onondaga county, and copied by the stenographer in the law office of the firm of which he is a member, and to which was added about 108 names not on any list, was then delivered by mail or personally to Mr. Crounse, who made up a list for proposed jury service therefrom, and who later visited the city of Syracuse and saw the assistant United States attorney in reference to the list, and was referred by him to other reputable persons to make inquiry as to the persons on such list and other persons fit and suitable for jury duty. Mr. Crounse saw highly reputable attorneys and business men, including one judge, and showed the list; and it was approved by them, with some additions and changes. He went to the places of business of some of the persons to whom he was referred, but did not find them all. This list, as changed by additions and erasure of names, was submitted to the clerk of the court as containing the names of men selected by Mr. Crounse, as proper and suitable to go into the jury box. The clerk of the court had secured the grand jury list of the county of Onondaga, and from this he had selected about 72 names, and he also went over the list submitted by Mr. Crounse with a person residing in the county of Onondaga in whom he had confidence, and erased a few names—some because he did not approve of them and others for the reason they had served as

jurors in the United States court within a year, and hence were disqualified to go in such box.

Mr. Crounse had caused to be made copies of the list as so made up from the list submitted to him by the assistant United States attorney. In copying lists he had previously availed himself of the services of the clerk or stenographer in the office of the United States attorney in Albany. This list for Onondaga county was not copied in that office. The list of names taken by the assistant United States attorney from the petit jury list of the county of Onondaga, with some 108 names added, but not containing all of the names on that jury list, and to which had been added the 108 names not on the lists as prepared by the jury commissioner of said county, as before stated, and made up in the manner and under the circumstances stated, went into the hands of the clerk of the court from Mr. Crounse as a list approved by Mr. Crounse, and was submitted by him to the clerk as a proper list of names in his judgment to go in the jury box. The clerk of the court added names to the number of 72 or 73 taken by him from the grand jury list of the county of Onondaga, as before stated, and after going over the list submitted by Mr. Crounse he selected therefrom, as he had the right to do, in the neighborhood of 200 names which he expressly approved. He did not disapprove the others, except in a few instances, and those names, as stated, were erased. There is no proof to sustain a finding, or facts proved to justify the inference, that the assistant United States attorney, in copying off names from the petit jury list of Onondaga county, selected the names of clients or friends. It is but fair to assume and find that the list was complete as to certain towns and wards and so far as it went.

A day was fixed for filling the box, and for certain good reasons and at the suggestion of the judge it was deemed advisable to place in the box about 600 names. The law provides that the box shall contain at least 300 names. The rule of the court provides that such box shall contain at least 400 names. The maximum number of names to go in the box is not limited by law or any rule of the court. On the day fixed for filling the box at the clerk's office in Utica, the clerk of the court and the United States jury commissioner were both present. The clerk had caused slips to be made by a typewriter in the clerk's office, each of which contained the name of one of the persons on the list finally submitted by Mr. Crounse, and to which list had been added the names from the grand jury list suggested by the clerk and the other names as above stated. These slips were in two packages, each package containing an equal number. In the package of slips containing names selected and adopted by the clerk as the names he desired to put in the box as above stated was included the names from the grand jury list and such of the names from the list submitted by Mr. Crounse as the clerk had so expressly selected and approved. The balance of the names on the list submitted by Mr. Crounse were in the other package, and this was handed to him. The clerk informed the commissioner of jurors what he had done and what the packages contained. The United States jury com-

missioner knew of the additions made by the clerk, and of the erasures from the list, and made no objection.

In legal effect this list of names was the joint list adopted by both the commissioner and the clerk. Both knew what names it contained, and neither objected. Both were content. It does not appear that either of them knew how the list that came from the assistant United States attorney was made up. The clerk had no information tending to show it came from that officer. The clerk and commissioner of jurors thereupon filled the jury box, placing all of said slips, some 618 in number, therein; the clerk putting in one from his package and Mr. Crounse one from his package alternately, until all the slips were in the box. The box was then locked and sealed, and the key was sealed up by Mr. Crounse under his own seal and deposited in the vault. Just before the day fixed for the drawing of the jury, grand and petit, for this term of court, and on May 18, 1915, Mr. Crounse resigned, and Mr. Weston, of the city of Syracuse, was appointed in his place, and he qualified and attended the drawing of jurors from said box to serve at this term of this court. This term of this court had been in session three weeks before this case was taken up for trial. It is conceded that the drawing of the grand jury panel and petit jury panel to serve at this term of this court from the box in question was in all respects regular, fair, honest, and in accordance with law. There is no evidence that the box referred to had been tampered with in any manner or by any person. The proof shows it had not been.

[2] It does appear that the names of jurors selected and placed in the box from which such panels were drawn are not apportioned to the several towns in the county of Onondaga or to the several wards in the city of Syracuse in said county in proportion to the persons residing in such towns and wards, respectively, subject to jury duty. In copying off names for the list so submitted by the assistant United States attorney in the first instance, or in making additions, no attention was paid to that. The clerk of the court, in making and approving his selection from such list and from the grand jury list, paid no attention to an apportionment of the names selected in accordance with the population of the various towns and wards, or in proportion to the persons liable to jury duty residing therein. The law does not require such an apportionment. The list furnished to the clerk of this court by Mr. Crounse, the commissioner of jurors, was also made up without any such reference, and in point of fact more names of qualified jurors in proportion were on such list from the town in which the assistant United States attorney had formerly lived, and from the ward of the city of Syracuse in which he now resides, and from one or two of the neighboring towns and wards, than from some of the other towns and wards of the county and city. Such a result in selecting names may come from the fact that the person or persons making the selection is quite liable to put the names of persons he knows on such list, rather than the names of those with whom he has no acquaintance whatever, unless he has in mind an apportionment of the list in accordance with either population or qualified jurors from

the various towns and wards. This, as stated, is not required by any law or rule of court in selecting lists of names of jurors for service in the courts of the United States.

[3] The clerk of the court was ignorant of the source from which Mr. Crounse obtained his list of names and the manner of their selection. He was not under any duty to inquire. In fact, I am of the opinion the clerk and jury commissioner each has the right of selection of his names absolutely independent of the other. There is no evidence that the assistant United States attorney had any desire or purpose to select, or copy off, or submit a list of partial or biased jurors—any other than good men. Nevertheless it does appear that approximately five-sixths of the names in the box from which panels of jurors were drawn for service at this term of court were copied off from the county petit jury list by those in or connected with the office of the assistant United States attorney. To these he had added nearly all the 108 names not on that list.

The assistant United States attorney is a gentleman of high character, and standing at the bar and in the county of Onondaga, where he was born and reared, as well as in the city of Syracuse, where he now resides and practices his profession. His integrity is unimpeached. He has had charge of many criminal cases, and has tried every case which has come to trial since his appointment to the office he now holds. He has not resorted to any measure or artifice which would justify a suspicion that he is other than high and just-minded, honest, conscientious, sincere, and devoted to duty. His leanings and tendencies are all to the side of mercy. An honest, intelligent, and fair-minded jury is all he desires in any case. This evidence shows nothing to the contrary. The fact that the list contains the names of many of his friends, some clients, and many people who know him, establishes nothing to the contrary. It shows he has friends, and that his law firm has clients, nothing further.

The lawyer charged with the duty of looking after and protecting the interests of his clients, as well as the clients themselves, instinctively shy at the idea of having their cases, civil or criminal, tried before and decided by a jury of 12 men taken from a larger body of men selected or named, even indirectly, by the attorney for the opposing party from the great body of citizens competent and qualified to perform jury duty, even if the men so selected are known to be of high, unquestioned, and approved character and conceded ability. This is true, even if such a selection is first submitted to and approved and confirmed by the commissioner of jurors and clerk, or those officials charged with the duty of selection and making up of jury lists for county or municipality. Such a mode of selecting jurors has never been sanctioned by legislative enactment or judicial decisions. It has frequently been condemned. Jury lists should, so far as possible, be free from suspicion or criticism. Confidence in our courts and the honest administration of the law cannot otherwise be maintained.

The Judicial Code (chapter 12, §§ 275, 276, and 277, Act of March 3, 1911, c. 231, §§ 275, 276, 277, 36 Stat. 1164 [Comp. St.

1913, §§ 1252, 1253, 1254]) provides, first, that jurors to serve in the courts of the United States, in each state, respectively, shall have the same qualifications, subject to certain provisions of the statute, and be entitled to the same exemptions, as jurors of the highest court of law in such state may have and be entitled to at the time when such jurors for service in the courts of the United States are summoned, and, second:

"Jurors, How Drawn.—All such jurors, grand and petit, including those summoned during the session of the court, shall be publicly drawn from a box containing, at the time of each drawing, the names of not less than three hundred persons, possessing the qualifications prescribed in the section last preceding, which names shall have been placed therein by the clerk of such court and a commissioner, to be appointed by the judge thereof, or by the judge senior in commission in districts having more than one judge, which commissioner shall be a citizen of good standing, residing in the district in which such court is held, and a well-known member of the principal political party in the district in which the court is held opposing that to which the clerk may belong, the clerk and said commissioner each to place one name in said box alternately, without reference to party affiliations until the whole number required shall be placed therein."

Then, third:

"Jurors, How to be Apportioned in the District.—Jurors shall be returned from such parts of the district, from time to time, as the court shall direct, so as to be most favorable to an impartial trial, and so as not to incur an unnecessary expense, or unduly burden the citizens of any part of the district with such service."

It is further provided that petit jurors shall serve but one term of court each year, and that in cases of felony, other than treason or a capital offense, the defendant shall be entitled to ten peremptory challenges and the United States to six, and that:

"In all cases where there are several defendants or several plaintiffs the parties on each side shall be deemed a single party for the purpose of all challenges under this section."

It is further provided that all challenges, whether to the array, or panel, or to the individual juror for cause or favor, shall be tried by the court. The restriction on the number of challenges allowed the defendants, especially where more than one defendant is on trial, emphasizes the idea that the names of jurors selected to be put in the box from which the panels of grand and petit jurors are to be drawn later for service at a term of court, and which panels are limited in number, should represent and call for men well qualified to serve who are fair and impartial, and who were fairly and impartially selected by the officers charged with the performance of that duty. Mere irregularities, which cannot be prejudicial to either party, have been quite generally held not to sustain a challenge to the array. The section of the statute fully quoted makes it plain that Congress sought to eliminate political considerations, or at least minimize that consideration, for the commissioner is to be of the principal political party opposed to that to which the clerk belongs and "a well-known member" of that party. However, when it comes to the selection of names to place in the jury box, such names are to be placed therein by such officers alternately and "without reference to party affiliations"; that

is, without reference to the political affiliations of the persons so selected for jury duty, if called upon to serve. There is no evidence tending even to indicate that the assistant United States attorney was actuated or influenced by any political feeling or motive. So far as evidence was adduced, it tended to show a fair and just political equilibrium in the make-up of the list of names.

It is evident from the reading of the statute that the *selection* of names to go in the jury box is to be made *by the commissioner of jurors and by the clerk of the court,* who are supposed to be indifferent and impartial as between the parties to any controversy coming or which may come before the court, whether civil or criminal. No other person or official has the right to participate in such selection. Others may, of course, answer proper inquiries properly made to them, or either of them, and give information to these officials as to the character and fitness of men, but may not select, and no person interested should be permitted to suggest, names.

The fairness, impartiality, and freedom from prejudice or bias of every juryman should be above well-grounded suspicion. There should be no question that the selection was made by those in whom the power is vested. To this end statutory directions as to the selection of jurymen should be followed in all essentials, unless they relate to mere form of procedure, and even in such cases a departure therefrom has in some of the cases been held fatal to the entire panel.

In the trial of causes, civil or criminal, it is not sufficient that you have in court, as here, a fine body of men, from whom, so far as appears, an honest, intelligent, impartial jury may be selected. In criminal cases, especially, it is all-important that all legal safeguards provided by the Legislature of the state, if we are in the state courts, or by acts of Congress, if we are in the United States courts, be observed. The jury system has the approval of all just-minded men, and will continue to have if it is properly administered. The Constitution provides that:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed."

In 24 Cyc. 212, it is said, citing authority:

"The jury commissioners appointed to make the selection cannot delegate that duty to any other person, but must themselves make the selection, and they cannot, by subsequently ratifying a selection made by some other person, render the selection valid." State v. Newhouse, 29 La. Ann. 824; Klemmer v. Mt. Penn Gravity R. Co., 163 Pa. 521, 30 Atl. 274.

In Klemmer v. Mount Penn Gravity R. R. Co., 163 Pa. 521, 530, 30 Atl. 274, in which state the mode of preparing jury lists and drawing and selecting jurors and panels of jurors is quite similar to that prescribed by the United States statutes quoted and referred to, the court held:

"The jury commissioners and the judge, in alternately selecting names from the whole qualified electors of the county, may use lists made up by themselves of persons whom they deem sober, intelligent, and judicious, although the information upon which their judgment is based is obtained from others."

The court in its opinion, after stating generally the duty of the jury commissioner and the difficulty of selecting names, said:

"There is not probably, in the county, a single person qualified from his own knowledge to do this. His ability to select must, in large degree, come from information derived from others. That the members of the board made private lists, prepared by themselves beforehand, of 'sober, intelligent and judicious persons,' proves nothing more than that they sought, by inquiry, to qualify themselves for a proper performance of their duty. If they had taken up the lists of the voters in the different districts, and at once made selections from nearly 30,000 names thereon, unless they were men thoroughly acquainted with the voters of every precinct, and of phenomenal memory, they would have been wholly incapable of performing the duty as the law enjoined. If they filled the wheel from lists prepared by others, no matter by whom, it was a gross violation of duty. But if they made up lists of sober, intelligent, and judicious persons themselves, on their own judgment, although on information obtained from others, this was the only way, in very many cases, that they could intelligently perform their duty. * * * If the fact were clear that this jury wheel had been filled by selections made by political and personal friends of the board, we would not hesitate a minute in sustaining the motion to quash, and in reversing the judgment. We would do this, even though as to irregularities of less gravity appellant might be treated as having waived them. One of this character no consent or waiver of parties could cure; it effectually undermines the foundation of the administration of justice. That sworn officers, intrusted with the performance of the highest duty, one on which hinges the life, liberty, and property of the citizen, should, to any extent, surrender their functions to personal and political friends, as stated by Judge Endlich, could not be tolerated for a moment in any court, even though the parties affected by it were willing to condone the wrong."

In Hewitt v. Gage, 71 Mich. 287, 39 N. W. 56, the court held:

"The selection of the jury, secured to litigants by our Constitution, is of first importance to parties, and they have a right to have such jury constituted in substantial conformity with the law as established; and where a departure has occurred, and the positive provisions enacted to * * * guard the right of trial by jury have been violated or disregarded, there is no warrant in our jurisprudence for treating the deviations as harmless irregularities."

In 12 Cyc. of Pl. & Prac. 291, it is said:

"The usual mode of procuring the names of persons eligible to jury duty is through various municipal officers and boards, whose duties, in that respect, are defined by statutes with which there should be at least a substantial compliance, though, as previously stated, slight irregularities or informalities in their conduct or proceedings, as failure to make return of the list of names from a particular locality, or to comply strictly with the requirement respecting the preparation of the list, will not necessarily invalidate it."

In U. S. v. Collins, 1 Woods (U. S.) 499, Fed. Cas. No. 14,837, it was held:

"A rule of court requiring the names of jurymen to be selected by a board of officers is substantially complied with by partially listing the names of persons furnished by a reputable citizen of a distant county within the district, on an application by one of the officers for a list of the names of proper persons residing in his vicinity."

In 24 Cyc. of Law and Procedure, 217, it is stated, citing numerous authorities:

"The statutory provisions with regard to making up the jury list are ordinarily held to be merely directory, and errors and irregularities in failing to comply strictly with their provisions, which are not prejudicial to the parties,

do not invalidate the list, or furnish any ground for challenging the array; but a substantial compliance with the law is necessary, and a disregard of the material provisions which make up the essential features of the system, and are designed to secure and preserve a fair and impartial trial, is not a mere irregularity, and is ground for challenging the array, even though it does not affirmatively appear that any injury has resulted therefrom."

From the authorities it is clear that the question here is whether it is plain that these defendants can suffer no injury or prejudice through the irregularity pointed out in the selection of the names to go in the jury box, and which were placed therein and from which this panel challenged was drawn, in case such defendants are compelled to go to trial before a jury of 12 men drawn and made up from such panel. It is not enough that the defendants may not be prejudiced thereby, but it must appear that they cannot be. Each juror called will be subjected to a rigorous examination as to his qualifications, opinions, bias, if any, etc.; but, after all this is done, even if no legal objection is found which disqualifies the juror, and after 12 such men are found, there remains to the defendants the right to peremptorily challenge 10 of the jurors drawn from the panel and found legally qualified to serve. For such challenges the defendants are not required to give any reason whatever. Would not the panel have been more equally distributed throughout the towns of Onondaga county and the wards of the city of Syracuse, and would not the liability, if any, to have men affected by passion, prejudice, tendencies to favor the prosecution, bias, etc., men not free from objection, on the jury as finally selected, be lessened, or minimized, had the copying from the petit jury list and the addition of the 108 names, which involved, in effect, a selection, been done at some place other than the office of the assistant United States attorney and free from any participation by him? Who can say with any certainty?

But behind and underlying all is the general principle, universally recognized, that the courts cannot justly or safely permit or sanction any participation by unauthorized persons, or by parties litigant, or their representatives, in the selection of names of persons to go on the jury lists, or in the jury boxes, from which panels for service are to be drawn, no matter how high-minded and conscientious the purpose of the party so participating, and no matter that his motive is purely to promote fair trials and just verdicts and the due administration of the law. The law has specified who is to make the selection of jurors, and it is unsafe and unwise to permit a departure from its provisions. Courts cannot stop to inquire in each case whether such participation, however indirect, has been harmful in a given case. The only safe rule is to prohibit and condemn it absolutely. And the government itself, as a party and representing all the people and their interests in prosecuting offenders and alleged offenders, is no exception to the rule. Only the clerk and commissioner of jurors are permitted by law to participate in the actual selection of names. When a panel is summoned, the jury for a particular case is drawn and selected by both parties under the eye of the court, and talesmen are selected by the marshal when necessary.

In State **v.** Newhouse, 29 La. Ann. 824, it appears that the statute of Louisiana provides for two jury commissioners, who are to receive a salary of $500 each per annum, and:

' "They shall select impartially from the citizens of the parish of Orleans having the qualifications requisite to register as voters the names of not less than five hundred good and competent men, a list of whose names shall be made out and returned certified under their hands to the clerk of the superior criminal court, to be filed by him in his office; said list shall be kept complete and supplemented from time to time. Each of the names on said list, and all supplemental lists shall be written out by said clerk on a separate slip of paper, together with the place of residence of each person, and the slips of paper on which shall be written the names and places of residence of persons on the said list, shall be placed in a box or wheel to be kept for that purpose by the sheriff of the court."

The statute then provides for the drawing of panels to serve at terms of the court from such wheel. It appeared and was found that:

"One Lionel Adams at the request of the commissioners of jurors forwarded them a list of 200 or 300 names, which such commissioners looked over and approved, and the names of such persons then went in the box or wheel."

The court says:

"The district judge was of opinion that this was a substantial compliance with the statute, and that the commissioners, *by approving*, made the list their own selection. We do not think so. To so hold would be equivalent to affirming that the commissioners could act by proxy or deputy in the performance of their very important and grave duties. Nothing in the statute justifies such an inference. Much less could their functions be performed by a person like Mr. Adams, who was, as it were, a mere bystander, under none of the obligations of an officer, or even of an agent or proxy. It is manifest that there would and could be no security for the accused against packed juries, if they be selected in this loose way. The intent of the law was that two responsible and competent men should, under the appointment of the Governor and under the sanction of an oath, select from all the voters of the parish a list of persons to serve as jurors; that they should inspect and select from the names of all the voters, and not simply inspect and approve what might be a 'cut and dried' list of 200 or 300 names. Such a system is too liable to abuse to be tolerated or sanctioned by courts charged with the lives and liberties of the citizens."

It has been suggested that under the evidence the list supplied to Mr. Crouse by the assistant United States attorney may have contained several thousand names copied from the petit jury list of the county of Onondaga as prepared by the commissioner of that county for use in the state courts. But, if it did, it was still incomplete, and in effect a list made by the assistant United States attorney, to which 108 names were added, and if Mr. Crouse then selected a list from that list it was still (except for the very few additions made by the clerk and one or two other persons) a list prepared by the assistant United States attorney. And when the clerk selected and approved 200 (or about that number) names from such smaller list so selected by Mr. Crouse, that 200 remained a part of the list copied and added to in the first instance by the assistant United States attorney. In any event some five-sixths of the names in the box from which the panel was drawn were a list taken by the assistant United States attorney from the greater body of qualified jurors of the county of Onondaga, and from which body he had in fact, but without any bad intent, ex-

cluded at least 2,000 names. No exclusion or partial or biased list was intended, and it is the duty of the court to say that the evidence fails to disclose that the name of a single improper person to serve as a juror (aside from one, possibly two, not taxpayers by self or wife) is found on the list. The jurors whose names are in the box are intelligent and sober men of high character and standing, an exceptionally fine body of jurors. This fact is not challenged or questioned.

It is not intended to hold or intimate, and is not held, that the clerk and commissioner of jurors may not prepare proposed lists of names, and then make careful investigation and inquiry as to the character and fitness of the persons whose names are in mind. This is a question of law, the facts stated having been proved, and not having been disputed, and this court has no discretion in the matter.

The challenge as originally made and as subsequently amended cannot be sustained, except in the one particular, that the list in the box was taken mainly from a list copied by the assistant United States attorney from the petit jury list of the county of Onondaga, and which it may be assumed contained a large part of such names, but still a part only, and to which the assistant United States attorney had added about 100 names not previously on any jury list. These facts, for the reasons stated as a legal proposition and matter of law, require that the panel in attendance here be discharged, the slips and names in the jury box removed and destroyed, a new list made up, selected by the clerk and commissioner of jurors and placed therein, from which a new panel may be drawn on due notice for service at this term of court, which will be in recess until Tuesday, August 31, 1915, at 10 o'clock a. m., when the trial of this case will proceed.

It is so ordered.