THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRED STURDIVANT, DEFENDANT-APPELLANT.

Argued September 28, 1959—Decided November 23, 1959.

*Mr. Thomas E. Durkin, Jr.,* argued the cause for defendant-appellant.

*Mr. Brendan T. Byrne,* Essex County Prosecutor, argued the cause for plaintiff-respondent (*Mr. Sanford M. Jaffe,* Legal Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant was convicted for the sodomy-murder of his stepdaughter, age 4½ years. The jury not having recommended life imprisonment, the death sentence was imposed.

Three alleged errors are urged. Our examination of the record indicates they are the only matters warranting discussion.

I.

Pursuant to *N. J. S.* 2*A* :74–2, the court directed the impaneling of a jury of 14. The panel was exhausted after 13 jurors had been selected, whereupon the court ordered

the sheriff to "return a *tales de circumstantibus* forthwith" to serve in the case. The fourteenth juror was chosen from among those produced by the sheriff's efforts.

On the third day of actual trial, presumably upon first learning of the circumstances complained of, defendant moved for a mistrial on the ground that Juror No. 14 had not been summoned in accordance with *N. J. S.* 2A:74–10 which reads in part:

"If more talesmen are required than the number of jurors remaining on the general panel, the sheriff or other proper officer shall forthwith summon, from among the bystanders or others, such additional number of persons qualified to serve as jurors as may be ordered by the court, and make return thereof immediately, and place the names of the jurors so returned in the box and draw therefrom until the jury is completed. * * *"

Upon the motion, the under-sheriff was examined. He testified that at about 3:45 P. M. he, by telephone, requested officers of eight large commercial companies, including the telephone company, to dispatch employees to the sheriff's office. He informed a vice-president of the telephone company of the court order and asked if "they could send us eight or ten people who might be considered for jury duty." The vice-president "asked me what kind of a case it was and I told him it was a murder trial." Four employees of the telephone company appeared that afternoon and 14 more the next day. The telephone calls produced from all sources some 35 prospective jurors. Of the four telephone company employees who responded on the day of the call, two went to the sheriff's office and were brought to the courtroom. The other two, of whom Juror No. 14 was one, went directly to the courtroom where they were found by the under-sheriff. All were named in the formal return to the court's order. Defendant of course knew they were talesmen.

The good faith of the under-sheriff was not questioned; in fact, it was conceded. Rightly or not, the time factor and the territorial situation presumably suggested the technique he used. There is no evidence as to how the specific em-

ployees were obtained within the telephone company. There is no suggestion that they were tainted in any way by anything said to them. The court offered to adjourn to permit defendant to adduce proof of prejudice in fact, but counsel declined to go beyond the limited showing we have described. There is no dispute that Juror No. 14 possessed the statutory qualifications, and of course he was examined by counsel before he was chosen to serve.

The issue is whether the under-sheriff departed from any principle, judicial or legislative, and if he did, whether that departure invalidates the conviction upon the showing described above.

■ A motion for mistrial was inappropriate in any event. Rather the motion should have been to remove the juror since a sufficient number would have remained to hear the case. See *U. S. v. Smith,* 253 *F. 2d* 95 (7 *Cir.* 1958), *certiorari* denied 357 *U. S.* 919, 78 *S. Ct.* 1360, 2 *L. Ed. 2d* 1364 (1958); *People v. Abbott,* 47 *Cal. 2d* 362, 303 *P. 2d* 730 (*Sup. Ct.* 1956). Nonetheless, a death sentence being before us and Juror No. 14 having been one of the 12 who returned the verdict, we will consider the merits of the issue.

It was the ancient function of the sheriff to select and summon jurors in response to the writ of *venire facias.* His discretion was described as "uncontrolled." 1 *Thompson, Trials* (1889), § 13, *p.* 12. The process was attended by abuses, chiefly the packing of juries. To guard against that evil, the English courts were authorized by statute to reform the panel by taking out names and inserting others. *State v. McCarthy,* 76 *N. J. L.* 295, 300 (*Sup. Ct.* 1908). To the same end, statutes today generally provide for the preparation of lists of jurors in advance of the court sessions, from which lists panels are chosen by lot, and from which panels jurors are chosen again by lot for service in individual cases. Such, of course, is the overall plan of our statute, with jury commissioners rather than the sheriff being charged with the duty to select qualified persons for inclusion in the basic jury lists. *N. J. S. 2A*:70-1.

■ There is no constitutional requirement for an affirmative statutory standard for the selection of jurors, *Fay v. People of State of New York*, 332 *U. S.* 261, 272, 67 *S. Ct.* 1613, 91 *L. Ed.* 2043 (1947). The nature of the subject precludes prescription of a detailed pattern. Beyond specifying qualifications of jurors, *N. J. S.* 2*A* :69–1, and exemptions from jury service, *N. J. S.* 2*A* :69–2, and forbidding certain practices, *N. J. S.* 2*A* :72–7 and 8, the statute commits to the discretion of the jury commissioners the ways and means to achieve the objective of "the just distribution of jury service among those persons qualified therefor in the various wards and municipalities" of the county. *N. J. S.* 2*A* :70–1. There is, of course, the cardinal principle that the constitutional right to jury trial means an impartial jury drawn from a cross-section of the county. Courts will not hesitate to strike down practices, however subtle, which are designed to subvert this principle, but they may not merely substitute their own formula for that chosen in good faith by the jury commissioners. *State v. Stewart*, 2 *N. J. Super.* 15, 20 (*App. Div.* 1949).

■ *N. J. S.* 2*A* :74–10, quoted above, authorizes the court to order the sheriff to summon additional "qualified" persons "from among the bystanders or others" to complete the jury. For the limited purpose of thus filling the jury box, the statute continues the historic role of the sheriff to select and return qualified jurors. The matter is committed to his discretion. There is no specific direction as to how or where in the county he shall procure the jurors. See *Patterson v. State*, 48 *N. J. L.* 381, 385 (*Sup. Ct.* 1886). He need not summon every man he meets. *State v. Bouvy*, 124 *La.* 1054, 50 *So.* 849, 851 (*Sup. Ct.* 1909). It would seem that he may "judge of their [statutory] qualifications in the first instance," but of course "ought not to interrogate them as to their opinions or bias." 1 *Thompson, Trials* (1889), § 27, *p.* 27. He must not wittingly select partial jurors or accept the suggestion of a litigant. *Boyles v. M'Eowen*, 3 *N. J. L.* 253 (*Sup. Ct.* 1810); *United States*

*v. Murphy,* 224 *F.* 554 (*D. C. N. D. N. Y.* 1915); *State v. Clark,* 256 *S. W.* 554 (*Mo. Ct. App.* 1923). In passing, we note that *N. J. S.* 2A:72–8 prohibits the return of any person who applies to the sheriff to be summoned as a juror. We need not discuss the precise reach of that provision since the facts before us are clearly beyond it; there is no suggestion that any of the talesmen sought to be summoned.

Defendant urges violation of the principle that the duty of selection may not be delegated to or exercised by a stranger to the office charged with that duty. *Robins v. Martin,* 44 *N. J. L.* 368 (*Sup. Ct.* 1882); *Glasser v. United States,* 315 *U. S.* 60, 85, 62 *S. Ct.* 457, 86 *L. Ed.* 680 (1942); *Re Petition for Special Grand Jury,* 50 *F.* 2d 973 (*D. C. M. D. Pa.* 1931); *Dunn v. United States,* 238 *F.* 508 (5 *Cir.* 1917). He contends the under-sheriff transferred his role to the several officers of the eight companies he reached by telephone. We think this is a strained view of the situation. The under-sheriff did not purport to commit the ultimate selection to them; that authority remained with him. Rather he sought by telephone to assemble expeditiously a sufficient number of persons to permit him to execute the order. We must keep in mind that we are here dealing with the selection of talesmen to complete a jury rather than with the preparation of a basic jury list, the situation presented in the cases just cited. The urgency which arises upon the exhaustion of the panel prevents a studied selection. The sheriff's approach inevitably becomes somewhat a hit-or-miss affair. This is not to say that the official may for that reason assign his role to another. Rather the point is that since he must act quickly, some allowance must be made for the exigency, and an honest recourse to techniques a court may find to be unwise or even irregular should not easily be construed to constitute a delegation of authority.

The State in part answers that a person becomes a "bystander" when he reaches the courthouse, no matter what antecedent circumstances induced him to come, and hence if the official there selects and summons him, the statute is

satisfied. *United States v. Meyer,* 113 *F.* 2d 387, 396 (7 *Cir.* 1940), *certiorari* denied 311 *U. S.* 706, 61 *S. Ct.* 174, 85 *L. Ed.* 459 (1940). In strictness, this probably is so, and suffices to show literal compliance with the statute. But of course such literal compliance will not foreclose inquiry into the impact of what preceded upon the right to a fair and impartial jury.

There was a sound reason to expand "bystanders" to include persons whose presence was prearranged by official action. In *State v. McDowell,* 123 *N. C.* 764, 31 *S. E.* 839 (*Sup. Ct.* 1898), the court approved of such an expedient for the reason that it was better calculated to produce an impartial jury than would be recourse to "the professional, loafing jurymen, who hang about the court houses," or who "may have been procured to be present by parties in anticipation of a failure of the regular panel." (31 *S. E.* at *page* 840). See also 50 *C. J. S. Juries* § 186, *p.* 920. But as *McDowell* points out, "how they happened to be present, is of no consequence, provided no fraud or collusion or improper action is suggested" and "provided, always, that no prejudice to the rights of the prisoner shall appear." And in *Cravens v. United States,* 62 *F.* 2d 261 (8 *Cir.* 1932), *certiorari* denied 289 *U. S.* 733, 53 *S. Ct.* 594, 77 *L. Ed.* 1481 (1933), in which it was held that the statute is satisfied "if the persons returned by the marshal are present in court when so returned," the court added that "how they happened to be present, is of no consequence, provided no fraud or collusion or improper action is suggested." (At *page* 270.)

The facts in *Cravens* parallel, although not quite perfectly, those before us. Directed to obtain additional jurors, the marshal went to a business house and informed the manager of his purpose to obtain a juror. He permitted the manager to designate a man whose absence "would disorganize the firm the least," reserving his right to pick another if he did not like the manager's suggestion. The court said it could not find "reversible error * * * in the way in which the order was carried out" (at *page* 270). In like vein, it

also held it was not "necessarily reversible error for the marshal to summon as talesmen men who had previously given their names to the marshal or his deputies as being available for jury service" when there is no evidence the juror was prompted by improper motive (at *page* 271). It is not clear whether the court deemed these practices to be within a proper exercise of the marshal's "discretion" or to be harmless irregularities. In *Klemmer v. Mt. Penn Gravity R. Co.,* 163 *Pa.* 521, 30 *A.* 274 (*Sup. Ct.* 1894), in which the basic jury list was attacked, the court found no impropriety in the circumstance that the members of the board considered suggestions made either voluntarily or in response to their requests to others for suggestions. *Cf. State v. Bass,* 186 *La.* 139, 171 *So.* 829 (*Sup. Ct.* 1936). Of course, as stated above, suggestions may not be accepted from a litigant. See also *N. J. S.* 2A:72–8 mentioned above.

In *Howard v. State,* 103 *Tex. Cr. R.* 205, 280 *S. W.* 586 (*Ct. Cr. App.* 1926), defendant complained of the action of the deputy sheriff in summoning talesmen from a list furnished him by the foreman of two railroad shops. Of this the court said: "It is unnecessary for us at this time to discuss this bill fully, but we believe that it might be proper for us to state at this time that this practice should not be commended, because, while in the instant case the bill does not show injury, still such practice, if tolerated, could result in serious injury both to the state and appellant alike."

In the light of the foregoing, we cannot say the under-sheriff violated any statutory provision or principle of law that hedges in his discretion. We think his course was unwise because it invited inquiry as to whether some disqualifying event may have occurred in conversations between the executives of the companies and the employees who responded to the transmitted call. And, in such situations, the court should permit, as the trial judge here did, an opportunity to explore the circumstances. But the mere possibility of some untoward event does not suffice to dis-

qualify the juror or to invalidate the final judgment. The fact is that the juror was fully examined for evidence of prejudice and none appeared.

■■ But if we should hold the under-sheriff legally erred, the result would be the same upon the record before us. The subject of reversible error in its specific application to the selection of juries was recently considered in *Meszaros v. Gransamer*, 23 *N. J.* 179 (1957) and *State v. Kociolek*, 23 *N. J.* 400 (1957). Although different views were expressed on the facts presented in those cases, there was common agreement that a showing of prejudice must be made if the irregularity is something less than a failure to comply with the essential elements of the scheme devised by the Legislature to assure impartiality. Here, there being no statutory method for the exercise of the sheriff's discretion in the selection of talesmen, it cannot be said the under-sheriff denied defendant the benefit of a precise statutory plan. Hence the irregularity, if one be found, is not vitiating in the absence of circumstances affirmatively suggesting prejudice. *Morgan v. Sun Oil Co.*, 109 *F.* 2d 178, 180 (5 *Cir.* 1940), *certiorari* denied 310 *U. S.* 640, 60 *S. Ct.* 1086, 84 *L. Ed.* 1408 (1940) ; 50 *C. J. S. Juries* § 191, *p.* 923.

■ Defendant further urges the talesmen were selected with indifference to the constitutional right to a jury truly representative of the community, citing *United States v. Glasser*, 315 *U. S.* 60, 85, 62 *S. Ct.* 457, 86 *L. Ed.* 680 (1942). His precise point is not clear. If he means that talesmen must be selected by a method appropriate for the preparation of the basic jury lists, it seems plain from the necessities of the situation that talesmen cannot be obtained by the same studied approach. See *State v. Ferraro*, 146 *Conn.* 59, 147 *A.* 2d 478 (*Sup. Ct. Err.* 1958). Moreover there is nothing in the record to suggest that the 35 individuals who responded did not represent a fair cross-section of the community. In fact, the under-sheriff's decision to gather jurors from eight large business establishments in the

City of Newark was reasonably calculated to reflect the population, urban and suburban. If the complaint is that the first four returned had a common employer, nothing in that circumstance is incompatible with the basic objective of an impartial jury.

## II.

The second issue relates to the receipt of rebuttal testimony. On the State's case, John Brady, a toxicologist, testified that upon microscopic examination he found spermatozoa on a slide prepared from a rectal smear obtained from the deceased. For the defense, two doctors testified they found no spermatozoa on the slide in question in an examination they made during the progress of the trial. Both had considerable experience in microscopic examination for sperm in seminal or vaginal specimens but neither had had experience with rectal smears. In rebuttal, the State recalled Mr. Brady and also Dr. Albano, the medical examiner, who in the direct case had been confined to the results of a post-mortem examination and autopsy. Their testimony in rebuttal, synthesized for present purposes, was to the effect that they examined the slides after the defense witnesses testified; that the sperm which Mr. Brady had originally outlined on the slide had bleached because of the effect of stains applied; that a fresh examination of the slides revealed other spermatozoa; that a microscopic examination is more difficult when the smear is from a contaminated source, here the rectum; that for this reason the microscopic study becomes a prolonged affair and the additional sperms were detected after a study of four hours, a period considerably in excess of the time expended by the defense experts who testified to a negative result.

We see no basis for criticism. The rebuttal testimony was provoked by the defense proof and was designed to combat it by explaining the difficulties inherent in the examination, particularly relevant because of the area of ex-

perience of the defense experts; to account for the change in the exhibit since Mr. Brady first examined it; and to show the continued presence of spermatozoa on the slide beyond the portion theretofore marked. The rebuttal was necessitated by the attack upon the exhibit which the State could not reasonably be required to anticipate and to disprove in advance of the assault. There was no purpose to deal unfairly with the defendant. That to some extent the testimony repeated what had been shown by the State on its direct case is no basis for rejection of rebuttal testimony which otherwise is proper. It may be added that in any event a trial judge is vested with considerable discretion in such matters, and accordingly his decision will not be disturbed merely because of some disagreement with it. *State v. Beard,* 16 *N. J.* 50, 59 (1954); *cf. State v. Menke,* 25 *N. J.* 66, 70 (1957). We note also that the trial court offered the defense an opportunity to produce surrebuttal evidence, which offer was declined.

## III.

The remaining question is whether the court properly refused to permit defendant's sister, Mrs. Campbell, to testify that seven days before the date of death, she saw her daughter, age 3½, insert a can opener into the vagina and rectum of the deceased. Mrs. Campbell was permitted to testify that on the same occasion the deceased inserted the can opener into her own rectum. Mrs. Campbell said she saw no bleeding.

We assume the trial judge permitted testimony as to alleged conduct of deceased a week before death on the thesis that the jury might find a disposition to self-abuse and hence infer the fatal injuries were self-inflicted on the day of death. *Cf.* 1 *Wigmore, Evidence* (3d ed. 1940), § 143, *p.* 579. That thesis was most unlikely in view of the nature of the injuries which we are about to describe, but of course the ruling was legally favorable to defendant. But with respect

to defendant's effort to show the alleged participation of the Campbell child in the event (the deceased and the Campbell child were not together at any time during the intervening week), the trial court sustained the State's objection.

 A defendant of course may seek to prove that another agency produced the death with which he is charged. It would seem in principle to be sufficient if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case. Speaking of another situation involving the same problem, Wigmore expressed the view, *Evidence* (*Vol.* 1, 3*d ed.* 1940), § 139, *p.* 573:

"* * * It is true that evidence of B's threats alone would not go far towards proving B's commission; but it is not a question of absolute proof nor even of strong probability, but only of raising a reasonable doubt as to A's commission; and for this purpose the slightest likelihood of B's commission may suffice or at least assist. The evidence of B's threats, to be sure, may, in a given instance, be too slight to be worth considering; but it seems unsound as a general rule to hold that mere threats, or mere evidentiary facts of any one sort, are to be rejected if unaccompanied by additional facts pointing towards B as the doer."

We think it not enough to prove some hostile event and leave its connection with the case to mere conjecture. Somewhere in the total circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case. The question of relevancy ultimately rests in a sound exercise of discretion. *State v. Rogers,* 19 *N. J.* 218, 229 (1955); *State v. Shiren,* 9 *N. J.* 445 (1952); 1 *Wharton, Criminal Evidence* (*12th ed.* 1955), § 149, *p.* 290; § 159, *p.* 305.

 There was no suggestion that defendant could prove the precise injuries allegedly sustained a week before death and then trace a fatal course. The only approach we can surmise would be to show that what was found on autopsy could be attributable to an unspecified injury of a kind that the object could have inflicted. If that possibility were reasonably present, defendant would have been entitled to

have the jury consider it. The trial judge could not find a fair basis for a connection between the event and the death. We think he properly exercised his discretion.

Dr. Albano, the medical examiner, found the following injuries, all of which in his opinion were incurred some time within a maximum of 6 to 8 hours before death. There were bruises, abrasions and scratches on the face and chest of the child. There were five irregular scratch marks on the right buttock. A bruise on the outer aspect of the left buttock measured about 5 inches in diameter. A bruise involving the right buttock, hip and thigh, measured 6 inches by 4 inches. Examination of the privates of the child revealed marked redness and swelling of the external parts; a rather large fresh laceration of a portion of the external parts extending upward into the vagina for a distance of about three-quarters of an inch; marked bruising of the vaginal wall at and above the laceration; the hymen "was ruptured, freshly lacerated." The uterus was surrounded by a large amount of blood. There was marked swelling and bruising of the crotch and the tissues surrounding the anus. The anus was open, being dilated to about an inch in diameter. There were numerous superficial and deep lacerations of the lining of the mucosa of the anus, one measuring three-quarters of an inch and extending into the rectum. There was marked bruising of the rectum for about two inches above its juncture with the anus. There was a massive internal hemorrhage (about 1½ quarts of blood) extending for seven inches above the anus. The hemorrhage was described as "fresh." The external bleeding in and from the rectum itself was negligible. (We add parenthetically, although not pertinent to the immediate inquiry, that the panties of the deceased and the shorts of the defendant were found to be stained with blood of the type of deceased's.) The witness was of the opinion that the vagina and rectum had been penetrated by a solid, blunt instrument. The penetration of the rectum was evident for a distance of two inches and the resulting bruising ruptured blood

vessels beyond the lining of the rectum, causing the massive internal hemorrhage described above, which in turn induced shock, the immediate cause of death.

Upon cross-examination, counsel for defendant scarcely touched the time estimate. Beyond a sweeping question which merely called for a blanket reiteration of the direct testimony, counsel explored the time factor only with specific reference to the three-quarter inch laceration of the anus and rectum. He asked "What was there about that laceration that leads you to believe that it was inflicted six to eight hours prior to death," to which Dr. Albano replied "There was a freshness about it. There were no marks of healing that I could see. The edges were raw, the color was red, there was no fading of the color of the tissues." We add the specific laceration just referred to was not the source of the fatal hemorrhage, which, as stated above, was caused by the rupture of vessels beyond the lining of the rectum.

Hence the cross-examination of Dr. Albano did not question his estimate of the time of the fatal injury. Nor was he asked whether an injury inflicted a week before could have accounted for the post-mortem findings. Nor did defendant offer any medical evidence either challenging Dr. Albano's testimony or suggesting that an injury antedating the six to eight hour period could have played a role. In short, there was nothing to suggest the possibility of a slow hemorrhage or of a fresh one somehow precipitated by an old injury.

Thus as the record stood at the time of the proffer of Mrs. Campbell's testimony, there was nothing to connect the alleged incident with the death. Defendant did not represent that other proof would supply the link. In fact the trial court sought to elicit such a representation from the defense but nothing of that character emerged from the colloquy.

At the oral argument before us, counsel for defendant suggested his sole possible source of support would be Dr.

Byrne. Dr. Byrne testified with respect to his examination of the rectal slide, as recounted in II above, and also with respect to another matter unrelated to the immediate issue. But significantly Dr. Byrne was not questioned with respect to the age of the injuries or Dr. Albano's interpretation of the post-mortem findings. In short, Dr. Albano's critical testimony stood unchallenged. The failure to examine Dr. Byrne in this area cannot be explained in terms of the exclusion of Mrs. Campbell's testimony. The time of injury was a vital part of the State's case for the reason that defendant was shown to have been with the child during that period. Hence any evidence that the fatal injuries were or could have been inflicted before that period would bear vitally on the issue of guilt. It would not have been incumbent upon defendant to prove or even to suggest another agency of injury in order to mount that attack upon the State's case. It is additionally significant that Dr. Byrne was called by defendant *before* Mrs. Campbell took the stand.

In these circumstances, we agree with the trial court that there was no rational basis upon which a jury could infer a reasonable possibility that the alleged event was connected with the death of deceased. *Cf. Edmonds v. State,* 163 *Neb.* 323, 79 *N. W. 2d* 453 (*Sup. Ct.* 1956).

The judgment is accordingly affirmed.

PROCTOR, J. (dissenting). I would reverse for the reason that the jury which found the defendant guilty was not a properly constituted tribunal. *N. J. S.* 2A:74-10 demands that when additional talesmen are required "the sheriff or other proper officer shall forthwith summon, from among the bystanders or others, such additional number of persons qualified to serve as jurors as may be ordered by the court, * * *." In the present case the under-sheriff assumed this duty, and in the fulfillment of it he had a certain measure of discretion. However, he had no authority to delegate the exercise of that discretion to a stranger.

"[T]he generally, if not universally, prevailing rule is that such a duty as that of selecting the persons to act as grand or petit jurors must be performed by the persons appointed to make the selection, and cannot be delegated by them to another or others. *State v. Newhouse*, 29 *La. Ann.* 824; *Klemmer v. Mount Penn Gravity R. R. Co.*, 163 *Pa.* 521, 30 *A.* 274; *Hulse v. State*, 35 *Ohio St.* 421; *Commonwealth v. Graddy*, 4 *Metc.* (*Ky.*) 223; *Clare v. State*, 30 *Md.* 163; 24 *Cyc.* 212; 12 *R. C. L.* 1016, 1017." *Dunn v. United States*, 238 *F.* 508, at *page* 511 (5 *Cir.* 1917).

See also *Glasser v. United States*, 315 *U. S.* 60, 62 *S. Ct.* 457, 86 *L. Ed.* 680 (1941); *United States v. Murphy*, 224 *F.* 554 (*D. C. N. D. N. Y.* 1915).

In the present case the under-sheriff permitted a stranger to select and dispatch two prospective jurors to the court-room. Juror number 14 was one of these and was subsequently chosen as one of the 12 jurors who passed upon the defendant's guilt. The under-sheriff testified that the first time he saw these two prospective jurors was when they were seated among the spectators in the courtroom. He further testified that he did not recall having any conversation with either of them. Indeed, he did not remember whether he ascertained their identity from them or obtained their names when they gave them to the clerk. Can it be said that the under-sheriff retained or exercised any authority of ultimate selection of the prospective jurors? *Cf. Cravens v. United States*, 62 *F.* 2d 261 (8 *Cir.* 1932), *certiorari* denied 289 *U. S.* 733, 53 *S. Ct.* 594, 77 *L. Ed.* 1481 (1933), cited by the majority, where the marshal expressly reserved his right to reject the suggestion of a prospective juror made by a third person. Did the under-sheriff in any sense select and summon "bystanders"? The situation would not be much different if the under-sheriff had simply asked an acquaintance to round up some people and send them to the courthouse to sit on a jury for a murder trial, and then had left on his vacation.

The statute speaks in imperative terms, *i. e.*, that the under-sheriff "shall forthwith summon" prospective jurors. The obvious meaning of the word "summon" in the context of

the statute is to compel appearance in court. Surely it does not mean that the under-sheriff may invite, or, as in the present case, ask a stranger to invite, persons who for reasons of their own may wish to serve upon a jury of a murder trial. I believe the under-sheriff violated *N. J. S.* 2A:74–10 by delegating the exercise of his discretion to an unauthorized person. And since the presence of juror number 14 on the jury was the result, it follows that the jury was not a properly constituted tribunal to determine the defendant's guilt.

The defendant should not be required to show actual prejudice. In *State v. Kociolek,* 23 *N. J.* 400 (1957), the special panel of forty-eight jurors in a capital case was drawn from less than the whole general panel. This court held the procedure to be in violation of *N. J. S.* 2A:74–9 and, without any showing of prejudice, reversed a judgment of conviction. The court said:

"It is not necessary to show actual prejudice; it is enough that the Legislature has so commanded; all that need be shown is that the jury was not constituted in accordance with the statute. * * * 'The question is whether a proper tribunal was established, and not whether an improperly established tribunal acted fairly.'" *Id.,* 23 *N. J.* at *page* 409.

The same reasoning applies to a violation of *N. J. S.* 2A:74–10, which this court in *Kociolek,* 23 *N. J.* at *page* 409, recognized to be a companion provision of *N. J. S.* 2A:74–9. The right to a legally constituted jury is at the very heart of our criminal law. To tolerate abridgment of that right unless actual prejudice can be shown is effectively to destroy it, since the defendant's burden of showing prejudice is in the nature of things unreasonably heavy. Moreover, scrupulous adherence to the requirements of the statute is necessary, not only in the interest of criminal defendants, but also in fulfillment of the State's responsibility to provide trial by fair and impartial juries. It seems to me that the selection of jurors by unauthorized persons destroys one of

what the majority calls "the essential elements of the scheme devised by the Legislature to insure impartiality."

The majority admits that the course taken by the under-sheriff was "unwise because it invited inquiry as to whether some disqualifying event may have occurred" before juror number 14 was made a member of the panel. To my mind the under-sheriff's course of action was more than unwise—it created the possibility of outside influences which might interfere with a fair and impartial trial for both the defendant and the State. I believe that the presence of such a possibility and its inherent capacity for harm is sufficient to require a reversal.

As to the other matters decided I am in complete accord with the majority.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, HALL and SCHETTINO—6.

*For reversal*—Justice PROCTOR—1.