SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. R.Y.** (A-60-18) (081706)

**Argued January 21, 2020 -- Decided May 6, 2020**

**FERNANDEZ-VINA, J., writing for the Court.**

This appeal centers on issues that arose during the trial and sentencing of defendant R.Y. for sexual offenses against two young girls, "Brianna" and "Sharie." Defendant contends that the trial court impermissibly excluded Sharie's statement to a caseworker that it was defendant's step-son who touched her. He also asserts that the State asked exceptionally leading questions of both girls during their trial testimony and that his sentence was manifestly excessive. The Court considers those arguments.

In August 2012, Brianna told her mother that defendant -- a family friend who, with his wife, sometimes babysat Brianna and Sharie -- had touched her "down there," pointing to her vagina. Sharie told her mother that he did the same to her. The next day, caseworker Thomas DeAngelis came to the house and interviewed both girls separately. DeAngelis' notes from his interview with Sharie state the following: "[W]orker asked if anyone has ever touched her in the bad part, and she said yes it was [Darren]. Worker asked what [Sharie] did and she said that she told him to stop and he did. Worker asked how many times he did [that] and she said just once. Worker asked if anyone else has touched her there and she denied." DeAngelis' notes from his interview with Brianna state that Brianna told him a "bad touch" was between her legs and that defendant had touched her there. The girls were then interviewed by Detective Lindsay Woodfield. The interviews were recorded and played at trial. Brianna stated in her interview that defendant placed his fingers in her private area. Sharie also stated that defendant had touched her with his fingers "many times." Defendant was indicted for aggravated sexual assault against both girls and endangering the welfare of both girls.

The girls both testified at trial. Sharie was asked who had touched her and she said, "I don't remember." The prosecutor then asked her if a girl or boy had touched her and, when she said, "A boy," whether it was "a small boy or a big boy." Sharie said, "A big." The prosecutor asked, "the man who lived in that house, was he the one that touched you?" to which Sharie replied, "Yes." On redirect, the prosecutor asked Sharie, "Do you like to talk about what [defendant] did to you?" She stated, "No."

1

The State moved to preclude DeAngelis from testifying that Sharie told him only Darren had touched her inappropriately. The trial court granted the State's motion, finding that defendant did not present sufficient evidence of third-party guilt. The trial court also held that the Rape Shield Law barred DeAngelis' testimony.

Defendant was convicted and sentenced to two concurrent twenty-year terms of incarceration on the aggravated sexual assault convictions, and two concurrent seven-year terms of incarceration on the endangering convictions, with an eighty-five percent period of parole ineligibility. The Appellate Division affirmed defendant's convictions and sentence, but it found that the Rape Shield Law "does not apply to the present situation." The Court granted certification. 236 N.J. 619 (2019).

**HELD:** The caseworker's testimony regarding Sharie's statement is clear evidence of third-party guilt and was therefore impermissibly excluded at trial. As such, the Court reverses the judgment of the Appellate Division and vacates defendant's convictions for crimes against Sharie. However, the State's leading questions were appropriate for the child victim witnesses, and defendant's sentence was not manifestly excessive with respect to the convictions for crimes against Brianna. The Court finds no reason to disturb defendant's convictions or sentence as to his offenses against Brianna.

1. The Court agrees with the Appellate Division that the Rape Shield Law does not apply in this case. New Jersey's Rape Shield Law restricts a defendant's ability to introduce "[e]vidence of previous sexual conduct with persons other than the defendant." N.J.S.A. 2C:14- 7(c). The law is intended to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim. Here, the testimony at issue does not seek to cast the victim as promiscuous or of low moral character, but rather to demonstrate who committed the acts at issue. The Rape Shield Law does not apply to exclude DeAngelis' testimony in this case. (pp. 19-20)

2. In order to introduce evidence of third-party guilt, the proof offered must have a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case. That standard does not require a defendant to provide evidence that substantially proves the guilt of another, but to provide evidence that creates the possibility of reasonable doubt. Here, Sharie's statement to DeAngelis could engender a reasonable doubt with respect to an essential feature of the State's case. A jury could find a reasonable doubt that defendant was the person who assaulted Sharie given her statement to DeAngelis that she knew what a "bad touch" was and that Darren was the only person who had touched her in a "bad touch" part. In sum, Sharie's statement to DeAngelis represents sufficient evidence that another person may have committed the crime for which defendant was on trial. (pp. 20-24)

3. The Court next considers whether Sharie's statement to DeAngelis would be admissible as a prior inconsistent statement. N.J.R.E. 803(a)(1) is an exception to the

2

hearsay rule. It provides that "[a] statement previously made by a person who is a witness at a trial or hearing" that "would have been admissible if made by the declarant while testifying" is admissible if it "is inconsistent with the witness' testimony at the trial or hearing and is offered in compliance with Rule 613." A judge may conclude that a claimed lack of memory is an implied denial of a prior statement, thus qualifying the prior statement as inconsistent and nonhearsay. Further, the prosecutor here sought to create an inference that defendant was the abuser. Following Sharie's initial testimony that she did not remember who touched her, the prosecutor eventually supplied the identity of the abuser on redirect by asking, "Do you like talking about what [defendant] did to you?" Based on the uncertainty of the identity of the abuser and the tenor of the prosecutor's examination, DeAngelis' testimony was both relevant and necessary. And the statement satisfies N.J.R.E. 613(b) because Sharie was available as a witness and could have been questioned by the State if it chose to do so. (pp. 24-27)

4. The exclusion of Sharie's statement to DeAngelis is not harmless error. That statement contradicted her later statements and calls into question the State's evidence against defendant in Sharie's case. (pp. 27-28)

5. Leading questions are frequently permitted in the examination of child witnesses. Noting that this case represents a typical example of when leading questions are appropriate, the Court finds that the trial court did not abuse its discretion in allowing the questions. Upon review of the record, the only questions the Court found problematic in the context of this trial were those through which the prosecutor moved from asking the identity of the abuser to supplying that identity, as noted above. (pp. 28-30)

6. The Court does not comment on defendant's sentences for crimes against Sharie and finds no reason to overturn the trial court's findings with respect to the aggravating and mitigating factors leading to the sentence for crimes against Brianna. The factors found were all supported by competent credible evidence. (pp. 30-31)

7. The Court vacates defendant's convictions for crimes against Sharie and remands for further proceedings consistent with this opinion. But the Court finds no reason to disturb defendant's convictions or sentence as to his offenses against Brianna. The Court disagrees with defendant's contention that the "allegations of both girls were inextricably linked" and that any error with respect to the case for crimes against Sharie should lead to the reversal of the convictions for the crimes committed against Brianna. (p. 31)

**AFFIRMED IN PART and REVERSED IN PART. The matter is REMANDED to the trial court for further proceedings.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion.**

SUPREME COURT OF NEW JERSEY
A-60 September Term 2018
081706

State of New Jersey,

Plaintiff-Respondent,

v.

R.Y.,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| January 21, 2020 | May 6, 2020 |

Susan L. Romeo, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora, Public
Defender, attorney; Susan L. Romeo, of counsel and on
the briefs).

Sarah D. Brigham, Deputy Attorney General, argued the
cause for respondent (Gurbir S. Grewal, Attorney
General, attorney; Sarah D. Brigham, of counsel and on
the briefs).

Alexander Shalom argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation,
attorneys; Alexander Shalom and Jeanne LoCicero, on
the brief).

1

This case calls on the Court to consider issues that arose during the trial and sentencing of defendant R.Y. for sexual offenses against two young girls. Defendant stood accused of sexually assaulting B.H. (Brianna) and S.H. (Sharie),[1] two sisters he and his wife were paid to babysit. During an initial interview with a Division of Child Protection and Permanency (DCPP) caseworker, Sharie stated that defendant's step-son had touched her "in the bad touch part." However, in a later statement to the police, she stated that defendant was the one who sexually assaulted her.

At defendant's trial, Sharie initially testified that she could not remember who had assaulted her. The State moved to preclude the DCPP caseworker's testimony regarding Sharie's statements against defendant's step-son on the basis that those statements were vague and not inconsistent with Sharie's trial testimony. The trial court agreed, and the defense was precluded from questioning the caseworker about Sharie's statements to him. Following a jury trial, defendant was convicted and sentenced to a twenty-year aggregate prison term.

---

[1] All names used in this opinion are fictitious to protect the identities of those involved.

Defendant appealed, arguing that the trial court impermissibly excluded Sharie's statement to the caseworker, that the State asked exceptionally leading questions of Sharie and Brianna during their trial testimony, and that the imposed sentence was manifestly excessive. The Appellate Division rejected defendant's arguments and affirmed his convictions and sentence.

We conclude that the caseworker's testimony regarding Sharie's statement is clear evidence of third-party guilt and was therefore impermissibly excluded at trial. As such, we reverse the judgment of the Appellate Division with respect to defendant's convictions for crimes against Sharie. We find, however, that the State's leading questions were appropriate for the child victim witnesses, and that defendant's sentence was not manifestly excessive with respect to the convictions for crimes against Brianna. Thus, we uphold the convictions and sentence for crimes against Brianna.

## I.

## A.

In August 2012, Brianna was five years old and her sister, Sharie, was seven years old. They lived with their mother, Margaret, their father, and their half-sister. Defendant R.Y.'s family was close friends with Brianna and Sharie's family. Brianna and Sharie referred to R.Y. as "Uncle R."

Defendant's family consisted of his wife Claire, his step-son Darren, and his step-daughter.

Margaret paid defendant and his wife to babysit Brianna and Sharie when other members of their family were unavailable. On the afternoon of August 30, 2012, Brianna told her mother that defendant touched her "down there," pointing to her vagina. Sharie told her mother that he did the same to her. Margaret then informed Claire that she would not be allowed to watch her children anymore. Margaret did not contact law enforcement about the incidents. However, the next day, DCPP caseworker Thomas DeAngelis came to the house and interviewed both girls separately.[2]

DeAngelis' notes from his interview with Sharie state the following:

> Worker asked if [Sharie] knows the difference between [a] good touch and [a] bad touch[,] and she said yes. Worker asked if [Sharie] could please show worker where is [a] good touch and she pointed to her arm. Worker shook her hand and asked if this was [a] good touch or [a] bad touch[,] and she said it was good. Worker asked [Sharie] if she knew where [a] bad touch was[,] and she became silent and would not answer. Worker asked again and she just shook her head yes. Worker asked [Sharie] if she would point and she did not want to. Worker said that he understands, worker asked if anyone has ever touched her in the bad part, and she said yes it was her cousin [Darren]. Worker asked what [Sharie] did and she said that she told him to stop and he did. Worker asked how many times he

---

[2] The record is unclear as to how the Division became aware of the allegations involved in the present matter.

did [that] and she said just once.  <u>Worker asked if anyone else has touched her there and she denied</u>.

[(emphases added).]

DeAngelis' notes from his interview with Brianna state that Brianna told him a "bad touch" was between her legs and that defendant had touched her there. She further told DeAngelis that defendant touched her under her underpants and that "he goes up into it" with his finger.  Brianna stated that Sharie had tried to tell defendant's wife Claire, but defendant "held her mouth."  Brianna stated the same thing happened to Sharie but she had not witnessed it and Sharie was sometimes present when the abuse happened to Brianna.

DeAngelis instructed Margaret to bring the girls to the Ocean County Prosecutor's Office Special Victims Unit.  The girls were then interviewed by Detective Lindsay Woodfield.  These interviews were recorded and played at trial.  The relevant portion of Detective Woodfield's interview with Brianna is as follows:

> Detective Woodfield:  Are there any touches you don't like?
>
> Brianna:  Yeah, by my Aunt [Claire] and Uncle [R.]
>
> Detective Woodfield:  And what's that?  What touch is that?
>
> Brianna:  Um . . . when Uncle [R] sticks far and uh . . . .
> . . . .

5

Detective Woodfield:  What does that mean?

Brianna:  In my private area.

Detective Woodfield: What does he stick in your private area?

Brianna:  His fingers.

Detective Woodfield:  His fingers?  Anything else?

Brianna:  (Shakes head no)
. . . .

Detective Woodfield:  Ok and when he sticks his finger up your private area, is it on the inside . . . of your private area?

Brianna:  (Nods head yes)

Detective Woodfield: And where is your underwear though?

Brianna:  They're on[.]

The relevant portion of Detective Woodfield's interview with Sharie is as follows:

Detective Woodfield: So what did you tell mommy yesterday? . . .  Did you tell her someone touched your special spot?

Sharie:  (Nods head yes)

Detective Woodfield:  And who did you say did that?  . . . What person did that?

Sharie:  My uncle.

6

Detective Woodfield:  Your uncle?

Sharie:  (Nods head yes)

Detective Woodfield: The one that we were talking about before? . . . . Uncle [R]?

Sharie:  (Nods head yes)

Detective Woodfield:  Okay and when he did that did he do it over your clothing or under your clothing?

Sharie:  Under.
. . .

Detective Woodfield:  And what did he touch your special spot with?

Sharie:  His finger.

Detective Woodfield:  His finger and was it on the inside or the outside?

Sharie:  Inside. . . .

Detective Woodfield:  . . .  Let me ask you this how many times did that happen?

Sharie:  Many times.

Detective Woodfield:  And where were you when that happened?

Sharie:  In the bedroom.
. . .

Detective Woodfield:  . . . [D]id you ever see him do that to anybody else? . . .  Did you ever see him do that to any of your sisters?

7

Sharie:  Only [Brianna]. . . .

Detective Woodfield: . . . Okay did . . . you tell [your] Aunt [] he does that?

Sharie:  I tried but he covers my mouth.

Detective Woodfield:  Oh you tried to but he covered your mouth . . . ?

Sharie:  (Nods head yes)

Detective Woodfield:  And what did he say when he did that?

Sharie:  He told me not to say it.

. . .

Detective Woodfield: . . . Okay anybody else there when [he touched you]?

Sharie:  (Shakes head no)

Following the interviews, the girls were taken to a medical center where Pamela Litman, a forensic nurse examiner, completed exams on both girls. She found a one-millimeter tear on Brianna's right labia which she testified was consistent with digital manipulation. Litman did not find any physical evidence of abuse during Sharie's examination, but she testified that this finding was not unusual and in fact that "it is more common to not find injury than it is to find injury."

8

After charges were approved against defendant, Detective Woodfield and others arrested him. Defendant waived his <u>Miranda</u>[3] rights and agreed to be interviewed by Detective Woodfield. That interview was recorded and played at trial. At first defendant claimed that he could not recall what happened. Then, the following exchange occurred:

> Defendant: The only thing I can think of was when I was tickling her and (inaudible) she probably slid down (inaudible).
>
> Detective Woodfield: And where was that, in your bedroom or living room?
>
> Defendant: [L]iving room while she started laughing.
>
> Detective Woodfield: Um, hm.
>
> Defendant: [B]ecause I'll start ticklin[g] her because I love her laugh.
>
> Detective Woodfield: She's a good girl. Which one? [Brianna] or [Sharie]?
>
> Defendant: [Brianna].
>
> . . . .
>
> Detective Woodfield: How many times did that happen?
>
> Defendant: Once.
>
> . . . .

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Detective Woodfield: Okay. So where, did you put your hand under her underwear?

Defendant: No.

Detective Woodfield: How did that happen?

Defendant: [Because] usually she has shorts on her.

Detective Woodfield: Um, hm. But I know it went like inside her vagina. I know your finger went inside her vagina. So I just, was it through the pant leg or was it down her top?

Defendant: No, I went (inaudible) like this.

. . . .

Detective Woodfield: Anything else happen?

Defendant: (shakes head no)

Detective Woodfield: . . . [S]o you didn't ever do this to [Sharie]?

Defendant: (shakes head no) If I did I don't know, I don't remember (inaudible).

Detective Woodfield: Um, hm. You can't remember? How come you think you can't remember things?

Defendant: Because, you know . . . . I used to take my blood pressure medicine before work (inaudible).

Defendant later confessed to touching Sharie inappropriately:

Detective Woodfield: Did you ever . . . do anything other than stick your fingers . . . in both of [them]?

Defendant: (shakes head no)

10

Detective Woodfield: That's all you did?

Defendant: (nods head yes)

B.

Defendant was indicted by an Ocean County grand jury for first-degree aggravated sexual assault of Sharie, contrary to N.J.S.A 2C:14-2(a); first-degree aggravated sexual assault of Brianna, contrary to N.J.S.A 2C:14-2(a); second-degree endangering the welfare of a child, Sharie, contrary to N.J.S.A. 2C:24-4(a); second-degree endangering the welfare of a child, Brianna, contrary to N.J.S.A. 2C:24-4(a); and third-degree resisting arrest, contrary to N.J.S.A. 2C:29-2(a)(3).

Sharie and Brianna both testified at trial. Sharie's examination by the prosecutor included the following interaction:

> Prosecutor: [W]as there ever a time that somebody touched you in a way that you didn't like to be touched?
>
> Sharie: Yes.
>
> Prosecutor: Yes, okay. And did that happen a long time ago or recently?
>
> Sharie: A long time ago.
>
> Prosecutor: A long time ago? And who touched you in a way that you did not like to be touched?
>
> Sharie: I don't remember.

11

Prosecutor: Okay. Well, let me ask you this, was it a boy, a girl or something else?

Sharie: A boy.

Prosecutor: A boy. Was it a small boy or a big boy?

Sharie: A big.

Prosecutor: A big boy. And when he touched you, what part of your body did he touch?

Sharie: Private.

Prosecutor: [W]hat part of his body did he use to touch your private?

Sharie: Finger.

. . . .

Prosecutor: When this man touched your private with his finger, did it happen at your house, his house or someplace else?

Sharie: His house.

. . . .

Prosecutor: Do you remember the name of the lady who lived in that house?

Sharie: [Claire].

Prosecutor: [Claire]. So there was a lady named [Claire] who lived in the house with the man who touched your private [area]; is that true?

Sharie: (Witness indicates)

12

Prosecutor: Yes?

Sharie: Yes.

Prosecutor: And it was the man who lived in that house, was he the one that touched you?

Sharie: Yes.

On redirect, Sharie's examination by the prosecutor also included the following exchange:

Prosecutor: Is this kind of hard to talk about?

Sharie: Yes.

Prosecutor: Yes. Do you like talking about what Uncle [R] did to you?

Sharie: No.

Prosecutor: No. And so is it hard to answer questions if a stranger comes and asks you questions about what Uncle [R] did?

Sharie: Yes.

Defendant testified and denied that he had touched the girls inappropriately. He testified that his statement to the police was the result of misleading questions, fear that he might be sent to jail, stress related to his wife's recent and third miscarriage, and concern for his family's financial welfare.

The State moved to preclude DeAngelis from testifying that Sharie told him only Darren had touched her inappropriately. The State argued that Sharie did not clarify that the "bad touch" she experienced was sexual, and so this statement did not qualify as a false allegation requiring a Guenther hearing.[4] The State claimed that the statement regarding Darren's alleged touching of Sharie was inadmissible under the Rape Shield Law, N.J.S.A. 2C:14-7, and that defendant's failure to notify the court prior to trial barred its admission. Defendant agreed that Sharie's statement was not admissible as a prior false allegation requiring a Guenther hearing. Instead, he argued that Sharie's statement to DeAngelis was admissible as a prior inconsistent statement under N.J.R.E. 803(a)(1). Defendant further argued that Sharie's accusation against Darren was admissible to demonstrate third-party guilt.

The trial court granted the State's motion, finding that defendant did not present sufficient evidence of third-party guilt with respect to Darren. The trial court also held that the Rape Shield Law, N.J.S.A. 2C:14-7(a), barred DeAngelis' testimony regarding Darren because defendant had not notified the court prior to trial that it sought to admit this testimony.

Pursuant to the trial court's ruling, DeAngelis testified regarding statements made by Brianna, and then the court excused the jury to conduct a

---

[4] State v. Guenther, 181 N.J. 129 (2004).

14

Rule 104 hearing on DeAngelis' testimony regarding Sharie. During that hearing, DeAngelis testified that when he discussed the concept of a "good touch" with Sharie, she said she knew what it was and referred to her arm. In response to the question: "[D]id she acknowledge if she knew what a bad touch was?" he answered "She didn't." DeAngelis stated that later, "[Sharie] shook her head [affirmatively] that she knew what [a] bad touch was but she did not verbally say." DeAngelis then asked her if anyone "did a bad touch to her in a bad touch part" and "[s]he said[] yes, it was . . . [Darren]." DeAngelis then testified that Sharie told him no one else had "done a bad touch on her bad touch part."

On cross-examination, DeAngelis expressed greater uncertainty regarding Sharie's understanding of "good touches" and "bad touches":

> Prosecutor: And also in regards to this conversation [with Sharie] about bad touch or good touch, you were never able to get clarification from [her] about what she was referring to in regards to bad touch; is that correct?
>
> DeAngelis: That is correct.
>
> Prosecutor: So, for example, you don't know whether that bad touch was in regards to a pinch, a punch or a sexual contact; is that correct?
>
> DeAngelis: That is correct.

The trial court held that this did not affect its earlier ruling precluding DeAngelis' testimony regarding Sharie's accusation against Darren.

15

Defendant was convicted of all counts except resisting arrest.  He was sentenced to two concurrent twenty-year terms of incarceration on the aggravated sexual assault convictions, and two seven-year terms of incarceration on the endangering convictions to run concurrently to each other and to the aggravated sexual assault sentences, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2(a).

Defendant appealed, raising three issues:  (1) his right to a fair trial was violated by the trial court's decision to exclude DeAngelis' testimony that Sharie initially stated Darren had touched her inappropriately; (2) he was prejudiced by the State's use of excessively leading questions during direct examination of Sharie and Brianna; and (3) the sentence imposed was excessive.  The Appellate Division affirmed defendant's convictions and sentence.  However, the court found that the Rape Shield Law "does not apply to the present situation" because "it [was] not clear that [Sharie's] 'bad touch' allegation involved sexual activity.  Moreover, even assuming it did, the accusation d[id] not relate to [Sharie's] sexual conduct, but to abuse against her by [Darren]."

We granted defendant's petition for certification. 236 N.J. 619 (2019). We also granted the motion of the American Civil Liberties Union of New Jersey Foundation (ACLU) to participate as amicus curiae.

II.

Defendant argues that his conviction should be reversed because the trial court erred in excluding evidence relevant to establishing the guilt of a third party. He argues that DeAngelis' testimony regarding Sharie's statement was a prior inconsistent statement and could have created reasonable doubt with respect to defendant's guilt. He further argues that the exclusion of this statement was not harmless error. Defendant also claims that he was prejudiced by the State's use of excessively leading questions when examining Brianna and Sharie. Lastly, defendant argues that the trial court imposed an excessive sentence.

In response, the State argues that DeAngelis' testimony was inadmissible hearsay not subject to any hearsay exception and thus cannot be used as evidence of third-party guilt. Regardless of these points, the State also argues the failure to admit the statement was harmless. The State further contends that the trial court properly exercised its discretion in allowing the State to ask Brianna and Sharie leading questions, and in imposing a sentence.

17

The ACLU primarily supports defendant's argument that DeAngelis's statement was not inadmissible hearsay and should have been admitted as evidence of third-party guilt. The ACLU also argues that the trial court erred in applying the Rape Shield Law to this case.

III.

A.

Where a "determination made by the trial court concern[s] the admissibility of evidence, we gauge that action against the palpable abuse of discretion standard." Brenman v. Demello, 191 N.J. 18, 31 (2007). A trial court's "discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury." State v. Cope, 224 N.J. 530, 554-55 (2016). Put another way, an abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)). "[A] functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue." Ibid.

The abuse of discretion standard governs the evidentiary issues before us, which we will consider in turn.

18

B.

To begin, we briefly address the trial court's reliance on the Rape Shield Law in its decision to preclude DeAngelis' statement regarding what Sharie told him. We agree with the Appellate Division that the Rape Shield Law does not apply in this case. New Jersey's Rape Shield Law restricts a defendant's ability to introduce "[e]vidence of previous sexual conduct with persons other than the defendant." N.J.S.A. 2C:14- 7(c). Such evidence "shall not be considered relevant unless it is material to proving the source of semen, pregnancy or disease." Ibid. New Jersey's Rape Shield Law "is intended to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim" and "does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character." State v. Garron, 177 N.J. 147, 165 (2003).

In State v. Perry, 225 N.J. 222, 236-37 (2016), we provided a two-step analysis for determining the admissibility of evidence regarding a victim's prior sexual conduct.

However, we need not conduct a Perry analysis here, because the testimony at issue does not seek "to cast the victim as promiscuous or of low moral character." Garron, 177 N.J. at 165. Rather, the testimony is introduced for the purpose of demonstrating who committed the acts at issue. As such,

19

the Rape Shield Law does not apply to exclude DeAngelis' testimony in this case.

C.

Because defendant argues that the trial court's exclusion of DeAngelis' testimony hindered his ability to present a theory of third-party guilt and deprived him of the opportunity to present a complete defense, we will review this Court's jurisprudence on third-party guilt.

"The Federal and New Jersey Constitutions guarantee criminal defendants 'a meaningful opportunity to present a complete defense.'" Garron, 177 N.J. at 168 (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). "[B]y implication, a complete defense includes a criminal defendant's right to introduce evidence of third-party guilt . . . ." State v. Cotto, 182 N.J. 316, 332 (2005). In order to do so, "the proof offered [must have] a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." State v. Fortin, 178 N.J. 540, 591 (2004) (quoting State v. Sturdivant, 31 N.J. 165, 179 (1959)). "That standard does not require a defendant to provide evidence that substantially proves the guilt of another, but to provide evidence that creates the possibility of reasonable doubt." Perry, 225 N.J. at 238 (quoting Cotto, 182 N.J. at 332).

As we have previously recognized, the concern with respect to claims of third-party guilt is "the ease in which unsupported claims may infect the process." State v. Loftin, 146 N.J. 295, 345 (1996). To avoid that issue, a defendant may not seek to introduce evidence in order "to prove some hostile event and leave its connection with the case to mere conjecture." Sturdivant, 31 N.J. at 179. "[T]he evidence a defendant seeks to admit in support of a third-party guilt defense must be capable of demonstrating 'some link between the [third-party] evidence and the victim or the crime.'" Perry, 225 N.J. at 239 (second alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 301 (1988)). Put another way, "[s]omewhere in the total circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case." Sturdivant, 31 N.J. at 179. "The decision to admit or exclude evidence of third-party guilt is 'particularly fact-sensitive' and rests within the trial court's discretion." Perry, 225 N.J. at 239 (quoting Loftin, 146 N.J. at 345).

In Koedatich, we reviewed several cases in which other courts have held that evidence of third-party guilt should have been admitted, including United States v. Green, 786 F.2d 247 (7th Cir. 1986). 112 N.J. at 300. In Green, the defendant argued that someone else could have committed the fraudulent activity of which he was accused, involving his work as a police officer. 786

21

F.2d at 252. The trial court allowed the defendant to present evidence that another officer "looked like [him], occupied the adjacent cubicle," and participated in activity similar to the fraudulent scheme at issue. Ibid. However, the court did not allow the defendant to present evidence that the other officer had previously been convicted of the same offense of which defendant was accused. Ibid. The Seventh Circuit reversed, finding that the trial "court erred in thinking that the fact of [the other officer's] conviction [was] irrelevant." Ibid. The panel further explained that the conviction "increased the chance that if [the other officer] conducted the interviews and was mistaken for [the defendant,]" he also committed the crimes at issue. Ibid.

By contrast, in United States v. DeNoyer, the Eighth Circuit determined that evidence demonstrating that "other deviant sex offenders were operating in the community . . . was properly excluded as remote and speculative." 811 F.2d 436, 440 (8th Cir. 1987). The court found that "testimony was pure 'red herring' and had no probative value in establishing the culpability of any party other than the defendant with respect to the offense involved." Ibid.

Here, defendant argues that Sharie's statement to DeAngelis that "she knew what a bad touch part was [and] her assertion that Darren was the only person who had touched her in a bad touch part, created a reasonable doubt" as to the State's claims against defendant. The State characterizes Sharie's

22

statement to DeAngelis as a "vague allegation" in that she did not specify that she understood what a bad touch meant, and that combined with her other statements, Sharie's statement to DeAngelis does not meet the standard necessary for introduction as evidence of third-party guilt, but could instead have been referring to some other kind of touch that Sharie did not like. We disagree and find that Sharie's statement to DeAngelis could "engender a reasonable doubt with respect to an essential feature of the State's case." Fortin, 178 N.J. at 591 (quoting Sturdivant, 31 N.J. at 179).

To begin with, Sharie's statement was not as "vague" as the State contends and in fact demonstrates that she did have an understanding of the difference between a "good" and "bad" touch. Moreover, Sharie's statement to DeAngelis did not leave open the possibility that she received more than one "bad touch" of any kind, as she explicitly stated that Darren was the only person who had touched her in a bad way. Defendant argues that he does not need to definitively prove Darren's touch also involved digital penetration, and we agree. A jury could find a reasonable doubt that defendant was the person who assaulted Sharie given her statement to DeAngelis that she knew what a "bad touch" was and that Darren was the only person who had touched her in a "bad touch" part. Therefore, we find that Sharie's statement to DeAngelis represents sufficient evidence that another person may have committed the

23

crime for which defendant was on trial, as opposed to "mere conjecture."

Sturdivant, 31 N.J. at 179.

D.

Having determined that Sharie's statement was evidence relevant to third-party guilt, we now must determine whether it would be admissible under the New Jersey Rules of Evidence. See Cotto, 182 N.J. at 334. We therefore review our case law regarding prior inconsistent statements.

"A statement, made other than by a witness while testifying, offered to prove the truth of the content of the statement is hearsay evidence and is inadmissible unless it falls within one of the hearsay exceptions . . . ." State v. Phelps, 96 N.J. 500, 508 (1984). One such exception is N.J.R.E. 803(a)(1), which provides that "[a] statement previously made by a person who is a witness at a trial or hearing" that "would have been admissible if made by the declarant while testifying" is admissible if it "is inconsistent with the witness' testimony at the trial or hearing and is offered in compliance with Rule 613." The relevant portion of N.J.R.E. 613, in turn, provides that

> [e]xtrinsic evidence of a prior inconsistent statement made by a witness may in the judge's discretion be excluded unless the witness is afforded an opportunity to explain or deny the statement and the opposing party is afforded an opportunity to interrogate on the statement, or the interests of justice otherwise require.

> [N.J.R.E. 613(b).]

24

"The quantum and quality of proof required to establish the antecedent reliability of a witness' prior inconsistent statement under N.J.R.E. 803(a)(1) depends upon the form of the statement and whether it is offered by the party propounding or adverse to the witness." State v. Baluch, 341 N.J. Super. 141, 178 (App. Div. 2001). When the inconsistent statement is offered by the adverse party, there is "no 'special reliability' requirement in addition to the core admissibility requirements of N.J.R.E. 803(a)(1) that the prior statement be inconsistent with the witness' trial testimony, offered in compliance with N.J.R.E. 613, and independently admissible under a hearsay exception." Ibid.

Defendant argues that Sharie's statement to DeAngelis was admissible as a prior inconsistent statement pursuant to N.J.R.E. 803(a)(1). The State responds that Sharie's statement to DeAngelis is not inconsistent with her trial testimony for two reasons. First, her testimony that she did not remember making the proffered statements was not inconsistent with those statements; and second, her statement that Darren was the only person who touched her in the "bad touch place" was not inconsistent with her testimony that defendant had digitally penetrated her. We disagree.

With respect to Sharie's failure to remember her prior statement at trial, a "judge may . . . conclud[e] under the circumstances the claimed lack of memory of the event is untrue and in effect an implied denial of the prior

25

statement, thus qualifying [the prior statement] as inconsistent and nonhearsay." State v. Brown, 138 N.J. 481, 542 (1994) (quoting 2 McCormick on Evidence § 251 (4th ed. 1992)), overruled on other grounds by State v. Cooper, 151 N.J. 326 (1997).

Further, the prosecutor sought to create an inference from Sharie's statement that defendant was the abuser. Following Sharie's initial testimony that she did not remember who had touched her, the prosecutor asked if it was "a boy or a girl" and then refined the question by asking if it was a "small boy or a big boy"? The prosecutor then began referring to "the man who lived" with Claire as the person who abused Sharie, to which Sharie agreed. And, on redirect, the prosecutor's questioning supplied the identity of the abuser when she asked, "Do you like talking about what Uncle [R] did to you?" Sharie replied, "No." Thus, while Sharie initially stated she did not remember who abused her, the prosecutor implied that it was defendant and was not contradicted by Sharie. Based on the uncertainty of the identity of the abuser and the tenor of the prosecutor's examination, DeAngelis' testimony was both relevant and necessary.

Because defendant sought to admit extrinsic evidence of Sharie's statement by introducing it through the testimony of DeAngelis, it must also satisfy the requirements of N.J.R.E. 613(b). The State argues that Sharie

26

testified "prior to defense counsel's attempt to introduce her statement through the extrinsic evidence of DeAngelis' testimony," and that, as a result, she was not afforded an opportunity to explain or deny her statement. But Sharie told the prosecutor on direct examination that she did not remember making the statement to DeAngelis. Therefore, any attempt by defense counsel to confront her with that statement would have been futile. We find that the fact that Sharie had previously testified is irrelevant to the determination of whether this evidence meets the standard of N.J.R.E. 613(b). Sharie was available as a witness and could have been questioned by the State if it chose to do so.

In sum, we find that Sharie's statement to DeAngelis is admissible as a prior inconsistent-statement. We next consider the State's argument that the trial court's error in excluding that statement was harmless.

E.

An error is harmless if "it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. The potential for an unjust result "must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Lazo, 209 N.J. 9, 26 (2012) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)). "[W]e consider the importance of [excluded testimony]

27

in the broader context of defendant's trial." State v. Bass, 224 N.J. 285, 308 (2016).

We agree with defendant that the exclusion of Sharie's statement to DeAngelis is not harmless error. That statement contradicted her statements made at trial, to Detective Woodfield, and to Sharie's mother, and calls into question the State's evidence against defendant in Sharie's case. We therefore vacate defendant's convictions for crimes against Sharie and remand for further proceedings consistent with this opinion.

F.

Defendant's final evidentiary challenge applies to the State's direct examination of both Sharie and Brianna. Specifically, defendant contends that the prosecutor's questions of the child witnesses in this case were excessively leading.

"Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." N.J.R.E. 611(c). That prohibition is "intend[ed] to encourage testimony from the witnesses, rather than evidence resulting from the prompting of counsel." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 8 to N.J.R.E. 611 (2016).

28

However, "[t]rial judges are vested with broad discretion over the mode of interrogation to 'make the interrogation . . . effective for ascertainment of the truth and protect witnesses from harassment or undue embarrassment.'" State v. Bueso, 225 N.J. 193, 206-07 (2016) (ellipsis in original) (quoting State v. T.E., 342 N.J. Super. 14, 29-30 (App. Div. 2001)). As such, "leading questions are frequently permitted in the examination of child witnesses." Id. at 207 (citing Biunno, cmt. 8 on N.J.R.E. 611(c) (stating that the questioning of child witnesses is "[a] prime example" of when leading questions are necessary)).

Defendant takes issue with several questions posed to Brianna and Sharie, including one question that the prosecutor asked Brianna, "And was it [Darren's] daddy who touched you?" as well as when the prosecutor asked, "But did Uncle [R., Darren's] daddy, did he touch you with your [sic] hand on your private?"

The State does not dispute that some of the questions asked of Brianna and Sharie were leading. Instead it argues, and we agree, that the leading questions were appropriate given the witnesses' young ages and the sensitive subject matter of their testimony. The testimony of both girls reveals their obvious hesitancy to speak openly regarding their allegations in public and demonstrates why some leading questions from the prosecutor were necessary.

29

This case represents a typical example of when leading questions are appropriate, and we find that the trial court did not abuse its discretion in allowing the questions. Upon review of the record, the only questions we found problematic in the context of this trial were those through which the prosecutor moved from asking the identity of the abuser to supplying that identity, as noted above.

We next turn to defendant's challenge to his sentence for his crimes against Brianna.

## IV.

Our review of a trial court's sentencing decision is limited to the abuse of discretion standard. State v. Robinson, 217 N.J. 594, 603 (2014). "What we seek by our review is not a difference in judgment, but only a judgment that reasonable people may not reasonably make on the basis of the evidence presented[.]" State v. Roth, 95 N.J. 334, 365 (1984). The appropriate review consists of "assess[ing] the aggravating and mitigating factors to determine whether they 'were based upon competent credible evidence in the record.'" State v. Bieniek, 200 N.J. 601, 608 (2010) (quoting Roth, 95 N.J. at 364-65). However, appellate courts may not "'substitute [their] assessment of aggravating and mitigating factors' for the trial court's judgment." State v. Miller, 205 N.J. 109, 127 (2011) (quoting Bieniek, 200 N.J. at 608).

30

In sentencing defendant , the trial court found aggravating factor two, the young age of the victims; aggravating factor three, the risk that the defendant will reoffend; and aggravating factor nine, the need for deterrence. See N.J.S.A. 2C:44-1(a)(2), (3), and (9).  It further found that those factors substantially outweighed mitigating factor seven, the defendant's lack of a criminal history.  See N.J.S.A. 2C:44-1(b)(7).

We need not comment on defendant's sentencing arguments with respect to the convictions for crimes against Sharie, and we find no reason to overturn the trial court's findings with respect to the aggravating and mitigating factors leading to the sentence for crimes against Brianna.  The factors found were all supported by "competent credible evidence."  Bieniek, 200 N.J. at 608.

## V.

In sum, we find that the exclusion of admissible evidence of third-party guilt requires vacation of defendant's convictions for crimes against Sharie, and we remand the matter for further proceedings consistent with this opinion. However, we find no reason to disturb defendant's convictions or sentence as to his offenses against Brianna.  We disagree with defendant's contention that the "allegations of both girls were inextricably linked" and that any error with respect to the case for crimes against Sharie should lead to the reversal of the convictions for the crimes committed against Brianna.

31

## VI.

The judgment of the Appellate Division is affirmed in part and reversed in part.  We remand the matter to the trial court for further proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion.